Good morning, honorees. My name is Kevin LeFay, and I am the attorney for the appellant, Sherry LeFay. I'd like to reserve a couple of minutes for questions. Great. The district court granted some re-judgment as to Mrs. LeFay's fourth amendment claim, based on your East Case 5150 alone, when the evidence strongly suggested that all she was was a victim of domestic violence who was trying to get away from her abusive husband. If permitted to stand, the district court's opinion would constitute a dangerous public incident for a number of reasons. First, as the district court concluded, there would be a lower standard for probable cause in the context of 5150s, as opposed to cruel arrest. There's no support in the law for that proposition. Indeed, the district court cited that. Second, an uncorroborated, disputed word of an estranged, abusive spouse could justify probable cause for, you know, you have the word estranged in this case. So, right now, abusive. But what do you do with a police officer when he gets caught on the scene? And he doesn't know. Let me explain. He doesn't know, you know, who's abusive, who's estranged. So, you know, you don't go into law school. You don't go into law school. He's in no position to be aware of these concepts. But what he has is he gets called. This man is telling him certain things about the woman. And some of the stuff that he says is corroborated by her. So I think it would be more helpful to us if you would argue with him in some less blunt terms how to deal with the situation. If the officer gets there and doesn't deal with him, what is the situation you're talking about? Your Honor, Officer Van Dersen has a way around the history of these two being together. And it's just voting that he had been aware of at least part of the lengthy conversation between these two people prior to making his approach. He also was told by Mrs. Dufay. Oh, so he knew that Mr. Dufay was estranged from his husband. That was the history of disagreements between them. And he had made a number of wrongs. That's right. He knew that. He also had to tell him about, you know, one of his ex-courts' notice that he is saying here that he is the same husband. Mrs. Dufay had a very visible prudence on her worthy forearm that she showed Officer Van Dersen that day and told him that he had been caused by Mr. Dufay. She showed him that. And he is, of course, totally aware of that. He takes what she says as the constant truth. But he is assuming that prior, I think you say he was aware of prior incidents. Was there incidents where the husband was arrested for having abused the wife? Were there incidents where the husband, the officer is aware that he has been convicted of espousal abuse? If she kept that, that's an altercation. One of the people, the one that didn't call the police, shows up close and claims that he was inflicted. How is an officer supposed to sort that out? How is he supposed to make the judgment? Oh, this is their abusive husband. As opposed to this, the wife's entitled to hit the husband himself. What can I do? Well, I guess I can understand. You know, you're in the car and you think, you know, the guy hit you and the police come along and they say, well, we don't know who hit you. You don't want to be able to get into a car and start crying. How does an officer make that decision? Well, I would hold Officer Van Dersen to account. There is some standard in that case. Officer Van Dersen himself said at age 497, with the record, that the injury is something that he had even where he, of course, denies being where it is. It would, of course, require him to investigate further. And that's exactly what POST requires. When you go to a 50-point-60 situation where there is an underlying domestic disturbance, it requires you to calm the situation down, to make sure you get the full story, and then and only then to make the determination. In this case, Officer Van Dersen made his determination after speaking in an interrupted fashion to Mrs. Lafay for only three minutes. For only three minutes. He spent eight minutes on scene, and he himself says the majority of that time he spoke to Mr. Lafay. It was said she believes that he's stealing her purse. Correct. Which is, yes, sir. And she says, yeah, he believes he's stealing my purse. So it's a corroborated story. Well, Officer Van Dersen says he drew no conclusions that Mrs. Lafay was delusional from the fact that her purse was missing, and he made no determination one way or another whether the purse had actually been stolen or whether she was delusional thinking it was missing. And as we know from the circle of domestic violence, one way that that occurs is you take the person's ability to move away, you take their financial independence away by stealing a purse. As explained, Mrs. Lafay accomplished all of those things. These officers retained their recognitions. Yeah, so let's both agree with your argument that there was likely an unprobable cause here, so there was a constitutional violation. Well, why does the officer still get qualified immunity? He does not get qualified immunity because it's been very well established to him in this circuit as far back as, I believe, 1988 in the banking case that the same level of probable cause didn't exist for a criminal arrest just to exist for 50 minutes ago. Yeah, but the qualified immunity requires an additional fine in order to find civil liability. So even if we thought that there was a fourth amendment violation here, we can't find that there's civil liability under 1983 unless we find that the officer should know exactly what the standards were and that it would have been obvious to an officer that he was not entitled to this way. It was a different standard. Understood. I think one great example of that, as you can look at post-1937, which speaks exactly to the situation that occurred here. Officer Van Dersen admits that he was trained in this learning domain and he failed to follow any of its genes. He's also an officer who had quite a bit of experience as an EMT and had taken quite a few people in on the 550, 550-150. And that's right, that he had been to many scenes like this. And with respect to another piece of evidence that was ignored in the record, he was a police procedures expert who in a district court failed even to acknowledge or mention in its summary judgment opinion who gave it litany of reasons why the officer's actions were unreasonable. First and foremost, however, even with such an expert opinion, even with not looking at whether the officer would have been on notice violating the law, not looking at some case law that would suggest if the officer had known the case law, that he would have been violating the defiance of such a case. Well, I think there's twofold bases in the case law. The remaining case, which I think is radiated in the Moynihan case, which is more recently declined, and also there are... So if I don't think those two cases are enough, is there another?  Because, frankly, it seems to me that I have a Hahn v. City of Folsom case where a police officer went the other way in similar circumstances. And I couldn't find another case that was exactly like this one, which really would have said that this officer won way or the other. In the Folsom case, it was pretty straightforward that it was a similar situation to what we had here. This is where, in the Folsom case, if you don't remember it, it's where the mother and dad asked the police to assess whether their 20-year-old, 23-year-old son needed to be placed on hold. And the officer listened to what they had to say, did what they suggested he should do in confirming it, and then said no. But in that particular case, given those instances, the officer said no, but even if the officer had known about that, wouldn't necessarily have said to him, I'm violating the law if I'd have gone the other way in this particular case. Where there are things that she said, that she even admits she says, that would lead in the other direction, because she says that she told them certain things because she's not eaten any meals for three days. She told them because she didn't tell them certain things, but she told them that. She told them she was being treated for fibromyalgia, general body pain, and depression. She told them she admits she's wearing clothes that has an unkempt appearance because she had been packing. There are other things. I mean, I'm trying to look at just the facts she talks about, which the officer now can look at, and then I'm trying to find the case which would suggest he wouldn't have qualified immunity. Well, Your Honor, 51-50 arrest, and by definition, all the rest of these are situational. There are many cases that this Court has decided, the Broome v. Burr voting case, Arpin, the Mendocino case, Fotheringham, all of which are significant cases. You have to perform a reasonable investigation under the circumstances, and when you come to a situation of domestic discord where someone is upset and they are injured and you only spend three minutes speaking with them, that is not reasonable and that is not entirely unqualified immunity. Indeed, if we look at Officer Van Der Zandt's own actions, he says that he did not have a chance to determine whether Mrs. Buffay's apparent signs of dehydration were consistent with the dehydration or whether it was just merely fatigue. He says he did not have a chance. Well, she confessed to the offense. She said that she hadn't eaten no dinner because she thought the food was poisoning her. She never said she had not drunk. Indeed, Officer, she said she had not eaten meals. And then Officer Van Der Zandt admits that he never dealt further to determine whether she had eaten snacks. Meals as opposed to snacks. That's correct. He specifically asked her if she had eaten meals and not whether she had eaten anything. Well, she did say she did also say she could not remember consuming liquid. Well, she says she couldn't remember the last time she consumed liquid, but in that respect, Officer Van Der Zandt says he didn't feel like he had a chance to delve into any issue. This was not a time-limited investigation. He could have spent as long as he wanted to dealing with these people to make sure he ferreted to truth before he involuntarily committed this crime. Moreover, with respect to dehydration and malnutrition issues, those are directly contradicted by the medical evidence. Once Mrs. LaFaye got medically checked, there was no sign that she was either malnourished nor dehydrated. She was weighing in at 5'6", 160 pounds, and her initial med check shows that she was hydrated. She was described as a well-nourished, hydrated individual. I mean, if you look at what was the photograph. Well, it shows that there's a graze out as to the reliability of Officer Van Der Zandt's determination, which he seems to be a police officer. They don't give a, you know. You know, he can't do a test to identify whether she's hydrated. I mean, her husband says she doesn't even think because she thinks I'm poisoning her. She makes statements that sound confounding to me. I mean, maybe if you process it carefully, if you have a lawyer, if you look at her cause of termination, you might find that very remarkable. But, you know, essentially, they confirm what the husband says. He's supposed to conduct a test on her to check to see whether she's hydrated or not. Well, you know, I don't believe what the test may claim because it casts doubt on his decision. And I just want to make sure that he does not go up to the table first. This was right after she was taken in for a medical evaluation on her. Well, yeah, I understand. But it's afterwards. This is how time works. You can't really do this. He doesn't know if he passed what the test is going to show. He doesn't even know if he's going to be able to do a test himself. He doesn't have the equipment. So even by his own admission, he did not know at the time. And he needed to know to determine probable cause. So he got a test for hydration. I'm not saying that. I'm saying that, however, he couldn't rely on the husband's words, particularly when he knew according to what I said. And she says, I don't remember the last time I heard her name. It was, you know, a family. She seems to confirm what the husband says. What does how I am affect him later on? She just shows you. How does that possibly play on the situation? Well, it goes to the issue of his credibility, and it also goes to the biological relationship to the woman. If Mrs. Fay, after being transported to a hospital in an ambulance, where presumably she did not eat a meal nor drink liquid, and there was a period of hydrated and nourishment, how did she look any different to husband and person? Well, the question is not whether she, in fact, the question is whether he was caused to believe that she's not hydrated, that she hasn't been eating. The fact that it turns out lately that she's given a test, and the test shows opposite. I just don't see how that plays on it. Well, what I think does play on it is Officer Anderson had to do his own investigation. And if you look at the petition, which is on page 221, it says in the fine print, the following facts are indeed the staff's research. And these are what he's representing. His investigation showed they justified asserting Ms. 5150 only against Mr. LeFay. But in his handwritten section that appears below, all it is is Mr. LeFay's allegations. He did not take a reasonable amount of time to deescalate the situation and to make his own determination as opposed to relying on the determination. I have a tough time with your argument about that because if an officer comes into a situation, he's got two people fighting, and he now takes, he's got to take one out first. He takes one, and he tries to go confirm the allegations in the second. That's why when I looked at this, even taking your facts and taking them exactly as you suggested, I looked at what did the husband tell the officer because that's what we've got to really look at because it's the officer's idea of the problem cause. So then I take your facts, and I say, okay, what part of your facts can confirm what the husband said? Confirm. And all I thought that this statement that you're referring to there is what the officer felt was confirmed of what the husband had told him. That's why he thought that was the way it was. He isn't saying the husband thinks it. That's what he thought after visiting with the husband, visiting with the wife, looking at the situation. These were the facts confirmed to him. If he had ever talked to the wife, that's one thing. But he did. I disagree in a few important respects. Mr. LaFay said that Mrs. LaFay was delusional. Officer Van Dersen said she was very responsive. He did not conclude she was delusional. Well, that says that he doesn't take the husband to his side. That says he makes an independent determination. But yet he writes in the 1550 petition that she was delusional. I understand what he wrote, but I also understand what he said. But everyone who is making a decision whether to do it, Mr. Coleman is a leader, but he wrote it. And he said she was delusional, even though he subjectively concluded that she was not. With respect to Alzheimer's, that's a non-issue. That's a neurological condition. And so there are many, many altercations that are going on. Thank you. We'll turn to your phone, so I can hold it. Good morning, matters. I'm Amtas Kaur. We are on behalf of the city of Fresno, the counties, specifically Officer Daryl Van Dersen. My remaining three defendant officers are not subject to this appeal. They're for subpoenas, which should be affirmed as to those three. That would be Sgt. Lynn Gleim, Detective John Gomez, and Officer Yara Keanubaker. With respect to Officer Van Dersen, it's my dispute that he had framed the probable cause to place the 1550 hold on Ms. Lafayette. And this decision was, in fact, confirmed at the hospital when she was presented to St. Agnes, where the policy of the hospital is that with the attending physician, as well as the social worker, me, and assessed the patient, they could, at that point, replace the hold if they so chose. In this particular instance, she was not. She was instead transferred to behavioral health to be evaluated by a psychiatrist. So Officer Van Dersen's decision to place the hold was, in fact, confirmed by the emergency room physician and social worker. There's information in the record that perhaps the social worker may have not have spent too much time with her or perhaps she may have seen her while she was sleeping. However, that was never explored in discovery. The social worker was never identified. The social worker was never deposed. And so that argument is very weak. And the bottom line is the policy at the hospital allowed for the hospital to transfer her to get that psychiatric treatment, which confirms Officer Van Dersen's decision to place the hold. The probable cause that he had, the information Officer Van Dersen had when he arrived on scene and, again, just like the court noted, based on his extensive experience, he was not only an emergency medical technician, he was also a paramedic for 10 years before becoming a police officer. And based on that experience, the undisputed facts show that he did have information about at least one prior call regarding this couple. And that happened about an hour before he arrived. Two officers from the Arizona Police Department arrived, responded to a call that Mr. Ife placed as the victim, alleging that his wife was screaming in a galley, taking prescription drugs, throwing things about, threatening to break out of his windows. Van Dersen did have that information when he arrived an hour later. Again, to a call that Mr. Ife placed, this time alleging that his wife was now attacking him. Mr. Ife is a disabled elderly man, as is Ms. Ife. She's an elderly female who exhibits the symptoms of having a disability. But Mr. Van Dersen, or I'm sorry, Officer Van Dersen, knew that Ms. Levitt admitted that she was suffering from depression. Upon him questioning her on her medical history, she became easily agitated and angry. He knew that she admitted, just as the court noted, that if she hadn't eaten in days, she'd have an opportunity to say, oh, but I've been smoking. But she never said that. She never told him that. She never denied jumping on her husband. When specifically asked, she was more concerned about this because she rehearsed that her husband continuously is stealing from her. That was what Officer Van Dersen was specifically asked to do, to position with respect to the delusion. Did you think that her thinking that her husband stole her purse made her delusional? No, Van Dersen said no. That wasn't what he thought made her delusional. The delusion is her thinking that her husband is trying to poison her. That was the fact that Van Dersen acknowledged was delusional. He also, based on his training and experience, evaluated her and determined that she was malnourished and dehydrated. This, I think, was later corroborated in her sentencing in a recorded interview where she said she tried to spit on her husband, but she couldn't because she didn't have any spit. That coincides with the person who is dehydrated. To Officer Van Dersen, she also saw I tried to determine what could properly say that the police officer had become a cause, and I looked at what is generally used for 5150 holds. There's an attempt to commit suicide or a threat to commit suicide in bias. Culture talks about killing anything. I talked about killing himself if the wife divorced him. He had access to gun and pain medication. In here, a plaintiff was intoxicated, had to be restrained, and said he would kill himself. And in the other case, it was where an individual's behavior was extremely dangerous and erratic. And it seemed like this case really meant any of those. So I was having a tough time really with whether there was a probable cause. Well, 5150 requires that Officer Van Dersen observe behavioral symptoms, not necessarily make a medical diagnosis. And what he observed was that she was a danger to her husband, who he indicated had a back disability. She jumped on him and was attacking him. She was a danger to him. In addition, based on his observations of her having to hold onto furniture as she was walking, claiming to have fibromyalgia, and peeing all over, the fact that she was so weak and had a body odor that even the paramedics said was so bad that you wanted to put gloves on, this created a concern for him that perhaps she was gravely disabled as well. So the danger to her husband and the grave disability as a result of her having to do something with Russian is what meets the criteria of 5150. Given Merriman v. Walden, an officer may not have a probable cause, and a reasonable officer would have made further inquiry before effecting the warrantless detention. Shouldn't this officer have investigated more? He only spent three minutes with her. The three minutes is an argument. I understand what it is, but it helps with the talk. Right, and our officers are put in situations, especially on a night in that week where they have to pay ex-lib debt. So, you know, split-second decisions. In this instance, based on his experience, he was able to evaluate her rather quickly, and I believe his testimony was he spent 60% with a husband, 40% with a wife. I don't believe he ever spent three minutes, but that's subject to check. How much time do you need to evaluate someone who's not being cooperative, who isn't able to give any concise, clear, short statement to the questions that were posed to her? He also corroborated that with her husband, who, at least to Anderson, appeared very genuinely concerned about his wife. He didn't want her arrested for attacking him. He wanted her to get medically cared and get help. Whether that was employed, whether he was acting, whether that was paid, I hope an officer of Anderson knew. If we were to determine that there is no probable cause here, in other words, the district court was too quick on its call that there was a probable cause, so now we're really looking at qualified immunity. The district court really didn't get to qualified immunity. Should we send this back to the district court to determine qualified immunity? I believe your honors have the authority to grant qualified immunity here today. Officer Anderson conducted this investigation reasonably. He conducted it the way an ordinary person would and he had good faith belief that he was doing the right thing under the law as he knew it at the time based on the facts that he was confronted with. There's no evidence that any officer would have done anything different. In fact, I think for a second, he went in an interview after the fact, corroborated everything he said. In fact, she provided more probable cause in that interview. She said she hadn't eaten in three days because there was no food in the house, that she was too sore to go to the store, that her house was a filthy, filthy, filthy pig pit because she was no longer able to keep up with her home. And as far as the bruise is concerned, Officer Anderson declared her a penalty for three. She never showed him a bruise. Whether she showed the officers who came an hour before, possibly. Whether she showed the paramedics, possibly. But what she did say is she suffers from brain fog, which causes her to be really confused sometimes. And perhaps she's just mistaken about that. That may have been disputed, Fabian, but it's not genuinely disputed. Anderson never saw the bruises. Had he saw the bruises, with his paramedic experience, being a police officer, he definitely would have been disadvantaged further. Based on what he saw that night, he was convinced that Ms. Lachey needed medical help. And that's why you made the determination, and therefore, the summary judgment should be affirmed as to Officer Anderson. The city also has an appeal in this case with respect to the courts in November. Oh, I'm sorry, before I even go there, with respect to the city of Fresno, there's been no evidence to show that there's any unlawful policy, practice, or procedure as to the city of Fresno. And if Officer Anderson hasn't committed any constitutional violation, then there really is no claim against the city of Fresno. But it really seems, for the record, that what the plaintiff wants is that if it goes back to court, they want their Monell claim revived. That's what it seems like they really want. I don't know that they're appealing the Monell ruling here, necessarily. They may even have moved away from it. But all they're suggesting is, if I win here, I want to be able to pursue my Monell claim when I go back to court. The plaintiff briefly specifically pointed to two interrogatories that the city responded to, and what the viewers are arguing is that because... I understand your argument. But I want you to think about it. If you look at the statement of the case in the opening brief, if you look at the footnote, if you look at what the district court said about the Monell claim, and finally in the reply brief, it's all about defending the Monell claim in trial. I'm not sure it's in front of us. Okay. I understand your argument. That may very well be true, and I just didn't want to waste my opportunity to argue that issue here. But I can move on. With respect to the city's appeal, it's as to the... Correct. The attorneys case order, the November 18, 2014 order, that was an order after the city filed the motion to modify the scheduling order to allow for the late exchange of expert records. In that motion, the city was a prevailing party, and in that order, the court found that there was no bad faith on part of the city, there was no gamesmanship, there was no willful failure, and in fact, the court... It sounds to me like the city said, it's not the city's cost, this cost can be borne by the plaintiff. So if you want, you know, with the relief you seek, but you pay, that's the money that you are enthroned. And of course, you're enthroned, so you're not going to sign. It seems that the kind of thing that the state judges do all the time is kind of denying the relief, which would have been harsh. Some people can issue the relief, but this is now imposing additional costs on the side. You can throw it if you want, but you have to pay the price. How can you possibly challenge that? Well, for the fact that, again, the court also acknowledged that part of that delay that gave rise to the city's need to file that motion was due to the failure of its failure to provide discussion. Well, that's what the judge looked at situationally, looking at all of the considerations aside, that you are the one who caused the problem, or, you know, sorry, you can't deny the relief that you seek. You get the relief, but you have to pay the price. It's not an determination that you have bad people, or it was bad faith, or anything else, which is simply a spilling of the baby. And I would think that you guys would be grateful to the city judges for not denying us relief and coming up with a solution that, you know, lets us do the thing which we're not afraid to do, but, you know, it doesn't live forever. You know, make sure it doesn't go across the lines. I understand you saying thank you to the city judge. I understand you already. I understand. If you're going to avoid having him deny you the relief the next time for being bad sports. And the city was grateful enough to stay from global sea last year. Grateful enough to remember you. You were obviously a senior, so I don't want to complain to you about it, so I don't know. That's not how I, you know, I see your attitude. It doesn't usually involve someone of you that would complain, but I would say it was your thing. The judge and I said, thank you for, you know, staying with you. I mean, basically, that's straight up misled. Absolutely. I mean, I may just do that, but does the city support excessive? And here's why. The city proposed a less drastic sanction, and the court agreed and said in this hearing that the city would be limited in its expert, would have to use his preliminary rough draft jury report, and that's what he's limited to. In addition, he is not allowed to comment on the opposing counsel's expert. And that was all discussed during the hearing. We argued that. At no time during that hearing did the appellants even request attorney's fees. That was never a subject of that underlying hearing. Yeah, I just want to confirm. As I understand it, when we were having this conference, the court invited the parties to submit formal motions about the discovery dispute. Right. And you're the only one that brought the motion. With respect to the motion, I thought it was initially ordered. Or even with respect to anything to do with the discovery dispute. The plaintiff brought to the court's attention that your failure to comply with the discovery dispute conference, but the court said at that point, Hey, this is just in a general conference. If you want to do something about that, file a motion. At that point, you filed a motion to extend the deadline. The plaintiff didn't file any motion whatsoever. Correct. Not for fees, not for anything. Correct. Not until after the court gave him unilaterally the opportunity to file a motion for fees. Correct. Thank you. Thank you. We're going to go way over your time. You can do this in the phone. Thank you. Thank you. Thank you. Thank you. Your Honor, if that's correct, Sirius was saying that some of the records No one at the hospital confirmed the 5150 contradiction for everything that's been recorded. Yes, though you said that I did. Well, no, they said that only the next five that occurred were these records. Yeah, well, they could have any person qualified. It was where she first went was to social work and decided it was better not to record. The first time that she was medically assessed, she received a 5152 screen. There was a social worker, a professional doctor, who gives information to the doctor. She was examined by a doctor. There was a social worker. We have to show the criminal side. It's just a mistake. I mean, it's just a mistake. What I looked up was across the street. The doctor himself admitted he was not qualified. Not every physician, not every MD is qualified to make a decision on a 5150. You have to have a certain certification for a medical officer in English. You didn't have one when the authorities had to release or impose on the department to continue the 5150. The hospital was the social worker, and she did not. I'm sorry, did you hear my question? I'm sorry, did you hear my question? Yes, there's no indication in the record that you heard my question. I did, but I might have misunderstood. The doctor is not qualified to tell the social worker he's a six-month recognition. He's qualified to say that, but there's no indication in this instance that it's occurred. So why does it have to be an indication? I mean, how do we know it happened if there's no evidence? How do we know it didn't happen? Because the doctor, I mean, in the late years, he acted on his own, but we don't know. I didn't ask the question. With respect to the evidence shows that the first time that Mrs. Fayot was speeching was released, and this is something that shows the district court's error. It relied on, it made an assumption that was not supported by the record that this tool was somehow to confirm downtime. First of all, probable cause is based on, let me offer you not what happens in the hospital. And second, that's the same problem with this 70-minute interview that was referred to that occurred months later. That should be considered either indeterminate or there was a probable cause that he existed. And so you want to consider that, yes, the tampon there's a problem. That could serve as a tactical response in terms of the history of all those stuff that's not going to be applied to the music that should not be concerned. Well, you raise yourself, and there's a hydration issue there, so I'm going to use your fingers and try to pull something out of your foot. And please don't understand me, but in case you're not going to stand up, I'm going to leave you here.
judges: Kozinski, Bybee, N.R. Smith